# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

STEVEN M. KAYLOR,                    )
                                     )
        Plaintiff,                   )
                                     )
    v.                              )          CAUSE NO.: 1:06-CV-410
                                     )
MICHAEL J. ASTRUE,[1]                )
Commissioner of Social Security,     )
                                     )
        Defendant.                   )

## OPINION AND ORDER

Plaintiff Steven M. Kaylor appeals to the District Court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for Disability Insurance Benefits ("DIB").[2] (*See* Docket # 1.) For the reasons set forth herein, the Commissioner's decision will be REVERSED and REMANDED to the Commissioner for further proceedings in accordance with this Opinion.

## I. PROCEDURAL HISTORY

Kaylor filed his DIB claim on February 4, 2003, alleging disability as of June 15, 1997. (Tr. 113-15.) His claim was denied initially and upon reconsideration, prompting him to request an administrative hearing. (Tr. 74-76, 92-100.) Administrative Law Judge ("ALJ") Bryan J. Bernstein held hearings on March 18, 2004, and July 6, 2005, during which Kaylor was represented by counsel, John Martin Smith. (Tr. 50-69, 386-408.)

---

[1]On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security, and thus he is automatically substituted for Jo Anne B. Barnhart as the Defendant in this case. 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d)(1).

[2]All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

No testimony was taken at the March 18, 2004, hearing, although a vocational expert

("VE") appeared.  (Tr. 386-93.)  The ALJ decided to continue that hearing due to insufficient

medical evidence.  (Tr. 389-390.)   The ALJ explained as follows:

> Since the medical records are insufficient.  I've talked to your attorney about this.
> I'm willing to continue this if you're satisfied with that, and try to get additional
> evidence.  Now, the evidence won't necessarily be medical evidence directly from
> a doctor.  But we might be able to establish through other sources, some measure
> of your condition, on or about the date of your insured – when your insured status
> expired, which was in the end of June in '97.  And that means, well, your attorney
> will explain it to you.  But if we can establish through reasonably believable
> source what was going on in your life, and the problems that you were having
> then.  Then we can have medical testimony, given what medical evidence there is,
> and we can relate back to your insured status.  And then perhaps establish that
> you were disabled back then.  Right now I couldn't do that.  And so at this point
> would [sic] not be in your interest for me to proceed and make a decision.  Do
> you understand?

(Tr. 389-90.)

The ALJ decided, then, to postpone the hearing, leaving Kaylor and his attorney, Mr.

John Martin Smith, with this instruction:

> What you're going to do for me is you're going to go out and plunge his, plunge
> him out of his, his history, some sources. . . . Whether it's a Bombless [sic]
> Shelter Officials, or somebody who's credible enough to, to establish the
> condition.  And then I will work with you in getting an expert, either from the VA
> that he already sees or perhaps he can talk to somebody there already, and say,
> listen, here's my situation.

(Tr. 391.)

Shortly after the hearing, on March 19, 2004, Kaylor's attorney sent the ALJ a letter

indicating that the ALJ had requested that he "summarize [their] discussion in regard to Mr.

Kaylor."  (Tr. 87.)  The letter explained that because Kaylor "was not insured and had no funds,

he did not seek medical attention until he discovered he would be eligible for Veterans

Administration medical benefits in September, 1997."  (Tr. 87.)  Smith wrote that he would try

2

to acquire information from "friends, co-workers, neighbors, etc., who can give a statement or affidavit as to the degree of his sickness[,]" and "a retroactive opinion letter from a Veterans Administration physician indicating that Mr. Kaylor's symptoms in June, 1997, were debilitating and consistent with the later diagnosis."  (Tr. 87.)  Smith next wrote, "If I am unsuccessful in getting a retroactive opinion from a Veterans Administration physician, you will attempt to get such an opinion from one of your consultive physicians."  (Tr. 87.)

On June 3, 2004, Smith next sent the ALJ a correspondence including a statement from Kaylor's brother indicating that Kaylor was ill in early 1997.  (Tr. 86.)  He also highlighted that the "VA medical records dated April 27, 1998, . . . stated that '. . . [Kaylor] had gross hematuria for about one year[,]'" referencing back to April 1997, prior to the DLI.  (Tr. 86.)  Then, on November 24, 2004, Smith supplemented the evidence with an affidavit from Kaylor's former neighbors, the Cordells, one of whom was also Kaylor's former employee.  (Tr. 83.)  The affidavit stated that Kaylor started having health problems in 1994, and then his condition worsened through 1996 when he started working partial days or not at all.  (Tr. 83, 381.)  They stated that he stopped working in 1997 and recalled Easter of 1997, when Kaylor had an episode at their home so painful he could not eat, had problems urinating, and was unable to drive home. (Tr. 83-84, 381-82.)

Smith also attached the statement of a longtime friend of Kaylor, indicating that he was ill in early 1997 and unable to work as of about May 1997. (Tr. 84, 385.)  Lastly, Smith again highlighted the April 1998 doctor note indicating that Kaylor had "a history of gross hematuria for approximately one year . . . ."

The second hearing took place on July 6, 2005, again with Kaylor, his counsel, and

3

another VE.  (Tr. 394.)  Kaylor presented a doctor's statement from April 1998 indicating that

Kaylor had been sick for over a year, implicating the period of time before his DLI, June 1997.

(Tr. 399.)  Kaylor also presented the affidavits from his brother, his friend, and his former

employee and friend, which the ALJ took a recess to review. (Tr. 381-85, 396-400.)  Kaylor,

through his counsel, argued that he did not seek medical treatment before the DLI because of his

lack of insurance and funds, and that he did not realize until September 1997 that he was eligible

for VA hospital treatment.  (Tr. 399.)  Smith described Kaylor's pain and discomfort beginning

in late 1996.  (400-01.)

The ALJ then directly questioned Kaylor about his income from 1993 and after.  (Tr.

401-02.)  Kaylor explained that after he left the Army in 1992 he worked very little because he

was living with his dad and "just didn't have to work."  (Tr. 401-02.)  He was self-employed,

worked sporadically, and had just gotten divorced.  (Tr. 402.)  He explained that he was in pain

from the end of 1996 through the beginning of 1997, and the "bleeding" started on Easter

weekend of 1997.  (Tr. 403.)  Kaylor then reviewed his medical history and cancer diagnoses

with the ALJ.

Smith also examined Kaylor about his work history and income.  When asked if he made

any profit, Kaylor testified that he "wasn't making much money at all."  (Tr. 405.)  "I could

maintain my truck . . . . after that second divorce and after my third army tour, I just didn't go

full speed ahead . . . . I was lazy."

After Kaylor's testimony, the ALJ explained how they ought to proceed.  The dialogue

continued as follows:

ALJ:   I am uncomfortable finding that there's adequate evidence of a – of the continuing
          problem.  It seems to me really this becomes a medical question, more, which is good, it

4

seems to me. More than just a, a, a credibility question. I mean, if, if it stands as a credibility question, it's, it's weak. It's weak now because I feel that he's inherently unreliable. It's because the time, you know, has passed since then and now. That it's the, the facts become hazy as to when something occurred and when something else occurred. And so it's really a difficult thing. However, it seems to me that the nature of these kinds of conditions is sufficiently predictable. That we might – what [sic] I'll be much more comfortable in writing to a [sic] oncological medical expert. What I want you to do is to summarize his testimony. Give as much detail about what his experience was and have him sign that. Then I will pick out of that what I feel is particularly reliable. If, if it's not at all. Maybe it'll be all of it. I mean if you get that support about his recollection that he's testified to here. And I'll package that with the essentials of the file. And I'll, I'll get a [sic] oncological expert somewhere, and, and –

ATTY: Okay. Now, can that, can that include sending some of the VA records that document in September and such, was that –

ALJ: Oh, of course. That's the whole idea is the VA records. His stuff is just sort of anecdotal. I'm not sure it'll be so sufficient to the, to the expert.

ATTY: Yeah. But we do have a pretty solid date of Easter weekend of 1997.

ALJ: Certainly a strong recollection on the part of him and a –

ATTY: And the Cordell's?

ALJ: Yeah.

ATTY: Yeah.

ALJ: So I mean, that's, that's something that's notable, and I'll make that point in my –

ATTY: Okay.

ALJ: – in my interrogatory, I guess –

ATTY: Okay.

ALJ: – you'd call it. Does that seem like a reasonable resolution?

(Tr. 405-07.)

On August 2, 2005, Smith sent a letter to the ALJ with the signed statement from Kaylor.

Smith wrote, "You requested a statement from Steve Kaylor describing the sequence of his

symptoms . . . .  It is my understanding that you are going to have a consultative physician give a retroactive opinion as to the consistency of Mr. Kaylor's symptoms when compared with the actual medical evidence generated after September 9, 1997 . . . . We have made [the statement] as detailed as possible to assist the consultative physician."  (Tr. 157.)

The ALJ responded five months later, on January 23, 2006, stating, "In the second hearing, I agreed to submit new evidence in the form of an affidavit and supplemental medical records to a medical expert in oncology.  I announced that I expected that you would provide a comprehensive statement of the claimant's symptoms and signs after the hearing to supplement his difficult testimony."  (Tr. 49.)  He continued, "I have received nothing from either you or from the claimant that would be worth sending to a medical expert.  The only medical records produced close in time to his alleged onset of disability were generated nine months after expiration of his insured status and over a year after the significant day described by the claimant and one of his supporting witnesses."  The ALJ stated that he would close the record unless provided with "useful records and statements that would warrant the attention of a medical expert."  (Tr. 49.)

Smith responded the next day, enclosing a "Request for Consultive Medical Advice" including a Statement of Background, Issue To Be Determined, and a series of questions to pose to the expert. (Tr. 42.)  However, the ALJ rendered an unfavorable decision a few months later, on May 4, 2006, without the benefit of any expert testimony.  (Tr. 37- 41.)  In his opinion, the ALJ stated that he "promised to seek medical evidence from an expert in oncology based upon evidence to be supplied by the claimant.  That supporting evidence was never afforded to the judge by the claimant. Thus, there has not been new material provided to supply to a medical

expert." (Tr. 40-41.) He concluded that the evidence "did not support a finding that the claimant experienced a disabling condition prior to the expiration of his insured status." (Tr. 41.)

On October 24, 2006, the Appeals Council denied Kaylor's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 4-6.) Accordingly, Kaylor filed a complaint with this Court on December 27, 2006, seeking review of the Commissioner's decision. (Docket # 1.)

## II. KAYLOR'S ARGUMENT

Kaylor presents two issues in this appeal. Kaylor first argues that because the ALJ did not obtain medical expert testimony, he committed legal error in failing to fully develop the record. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 10.) Kaylor next contends that the ALJ improperly evaluated his credibility. (Opening Br. 12.) Lastly, Kaylor requests that the Court recommend that the agency appoint a different ALJ to hear his case. (Opening Br. 13.)

## III. FACTUAL BACKGROUND[3]

### A. Background

At the time of the ALJ's decision, Kaylor was fifty-three years old. (Tr. 113.) He completed high school in 1971 and subsequently two years of college. (Tr. 123.) Kaylor served as a paratrooper in the United States Army in 1971 through 1974, 1985 through 1989, and 1990 through 1992, and his experience included that of radio operator and artillery observer. (Tr. 118, 149, 158.) He was also self employed as a roofer, siding applicator, and remodeler for some

---

[3]The administrative record in this case is voluminous (408 pages), and the parties' dispute involves only small portions of it, namely whether the ALJ improperly evaluated Kaylor's credibility and whether the ALJ should have consulted with a medical expert before rendering his opinion. Therefore, in the interest of brevity, this Opinion recounts only the portions of the record necessary to the decision.

time until 1997.  (Tr. 118, 158.)  In his Opening Brief, Kaylor alleges that he is disabled due to "recurrent bladder cancer with complications."  (Opening Br. 2.)

Kaylor testified at his second hearing that he lived with his father after leaving the army in 1992.  (Tr. 401.)  He stated that he had just gotten divorced and worked sporadically, and that "he didn't need income really."  (Tr. 402.)  As a self-employed roofer and sider, Kaylor took odd jobs here and there.  (Tr. 402.)  He stated, "[A]fter that second divorce and after my third army tour, I just didn't go full speed ahead . . . . I was lazy."  (Tr. 405.)

In his statement dated July 21, 2005, Kaylor explained that he started experiencing health problems in October 1996, and he recalled a day that month when he had to leave work at noon because of abdominal and back pain and nausea.  (Tr. 158.)  Kaylor stated that these pains continued during the following months, several times per week, and sometimes became so severe that he would pass out.  (Tr. 158.)  He worked on and off until February 1997, when he stopped entirely.  (Tr. 158.)  Both at his hearing and then in his statement, Kaylor described a particular incident on Easter weekend of 1997 (March 29, 1997) when he became extremely ill at his friends' house, having difficulty urinating, experiencing nausea, and ultimately passing a blood clot.  (Tr. 158, 403.)  He stated that he also began passing blood, which continued for "nearly a year" until his surgery in April 1998.  (Tr. 158.)

Kaylor's father was paralyzed and ultimately moved to a Veterans Administration hospital where he stayed until his death in 2001.  (Tr. 405.)  In his statement, Kaylor indicated that after his father's house sold in August 1997, he became homeless and lived in a shelter.  (Tr. 159.)  Kaylor explained that he did not seek medical treatment because he did not have health insurance or money for health care; he did not realize until September 1997 that he was eligible

8

for treatment at the VA hospital. (Tr. 159.) He has apparently been homeless on and off from 1997 through 2005, living in various shelters in and near Fort Wayne, Indiana. (Tr. 11, 14, 320, 365, 377.) At his hearing, Kaylor testified that he has had cancer four times. (Tr. 403.)

### B.  Summary of Medical Evidence Pertaining to Kaylor's Impairments

Kaylor was last insured for DIB on June 30, 1997; however, there are no medical records in evidence prior to that date. The record of Kaylor's alleged disabling impairments begins on October 29, 1997, when Kaylor went to the urology clinic at the Veterans Administration Medical Center ("VAMC") in Fort Wayne, Indiana, presenting with gross hematuria[4] and severe pain. (Tr. 373.) Upper tract studies of the right calyceal tract revealed "a normal ureter and a large filling defect consisting of intra-vesical lobe versus blood clots . . . . smooth and midline in origin." (Tr. 373.) The study was otherwise negative. (Tr. 373.) Kaylor also spoke to a social worker that day, requesting "cold weather gear" and relating that he was homeless, staying at a mission at night, and that he had recently been reunited with his "kidnapped" teenage son. (Tr. 373.) He returned a few days later to seek assistance in staying at a shelter. (Tr. 373.)

Kaylor returned to the VAMC on November 18, 1997, to follow up on his gross hematuria, which, the physician noted, had been ongoing for three weeks. (Tr. 371.) A renal ultrasound and IVP revealed no abnormalities, but a cystoscopy[5] showed several erythematous areas in his bladder and some blood clots. (Tr. 371.) Kaylor reported that he was still bleeding and experiencing significant pain, and he informed the physician that he had a history of passing kidney stones. (Tr. 371.) The doctor decided that Kaylor should undergo a cystoscopy under

---

[4]"Gross hematuria is "the presence of blood in the urine in sufficient quantity to be visible to the naked eye." STEDMAN'S MEDICAL DICTIONARY 864 (28th ed. 2006).

[5]A cystoscopy is "[t]he inspection of the interior of the bladder by means of a cystoscope." STEDMAN'S MEDICAL DICTIONARY 486 (28th ed. 2006).

anesthesia with a bladder biopsy and retrograde pyelogram, and prescribed him Tylenol #3.  (Tr. 371.)  Bilateral retrograde ureterograms performed a few days later on November 24, 1997, returned normal results.  (Tr. 369.)

On January 7, 1998, Kaylor underwent a CT of his abdomen and pelvis, which had unremarkable results.  (Tr. 367.)  Dr. Christopher Steidle also examined Kaylor that day at the urology clinic, noting that Kaylor had "a five-month history of what he claims is gross hematuria."  (Tr. 366.)  The doctor reported that various tests performed on Kaylor returned negative results, but Kaylor was passing fibrinous blood clots.  (Tr. 366.)  Dr. Steidle ordered a blood profile.  (Tr. 366.)  Kaylor returned to Dr. Steidle on February 18, 1998, relating a history of "passing 30 to 40 clots per day," even though his work-up came back negative.  (Tr. 365.)  Dr. Steidle referred Kaylor to the emergency room for a nephrology[6] consultation.  (Tr. 365.)

On March 2, 1998, Kaylor was hospitalized at the VAMC in Fort Wayne and saw Dr. Daniel Santos, who diagnosed him with gross hematuria etiology undetermined, bronchitis, and hyperlipidemia.  (Tr. 162.)  Kaylor had "recurrent pain in his left lumbar area with radiation to the scrotum and persistent hematuria of six months' duration, [and] developed increased pain and hematuria with clots shortly before admission."  (Tr. 162.)  Dr. Santos noted that Kaylor smoked two packs of cigarettes and drank two to four beers daily for about twenty-five years.  (Tr. 162.)  He placed Kaylor on antibiotics and pushed oral fluids.  (Tr. 163.)  Dr. Santos noted that blood was in Kaylor's urine specimen, but discharged him in a stable condition on March 5, 1998, "since [there was] no pallor and no apparent change in hemoglobin or hematocrit[.]"  (Tr. 163.)  Dr. Santos wrote that Kaylor was to undergo a nephrology consultation in Indianapolis.

---

[6]Nephrology pertains to "[t]he branch of medical science concerned with medical diseases of the kidneys." STEDMAN'S MEDICAL DICTIONARY 1290 (28th ed. 2006).

(Tr. 163.)  Dr. Steidle saw Kaylor on March 4, 1998, as well, and again recommended a nephrological work-up, stating that Kaylor "is to go to Indianapolis ASAP."  (Tr. 365.)

On April 6, 1998, Kaylor was again hospitalized.  (Tr. 165.)  He had "recurrent pain in the left flank, left lumbar area and left lower quadrant of the abdomen and persistent hematuria of 6 months' duration, [and had] developed increasing bright red blood in the urine and left lumbar and left flank pain the night before admission."  (Tr. 165.)  A CBC showed hemoglobin of 7.6 grams.  (Tr. 166.)  A urine drug screen tested positive for cannabinoids.  (Tr. 166.)  A urine culture revealed no growth.  (Tr. 166.)  Kaylor underwent an intravenous urogram on April 6, and the doctor's impression was that he had a high-grade obstruction of the left-sided collecting system.  (Tr. 363.)  Kaylor was admitted to the Acute Care Unit and given two units of packed cells, as well as analgesics for pain.  (Tr. 166.)  His pain and gross hematuria did not cease, and he was transferred to the Indianapols VAMC on April 7, 1998.  (Tr. 166.)

On April 23, 1998, Kaylor saw Dr. Santos, who conducted a CT scan of the thorax.  His impression was "[o]ne single, tiny, calcified right hilar node" and "coronary artery calcification" and noted that Kaylor's history was "[l]eft renal papillary cancer."  (Tr. 362.)  Then, on April 27, 1998, Kaylor was hospitalized at the Indianapolis VAMC, where he underwent a left nephroureterectomy.[7]  (Tr. 379.)  The doctor wrote that Kaylor had a history of gross hematuria "for approximately one year" and mentioned that a ureteroscopy with biopsy revealed transitional cell carcinoma.  (Tr. 379.)  Kaylor was apparently discharged May 4, 1998, and two days later, a CT of the abdomen with and without contrast showed some free fluid in the pelvis, possibly related to his recent surgery, and soft tissue infiltration anterior to the bladder.  (Tr. 361,

---

[7]A nephroureterectomy is the "[s]urgical removal of a kidney and its ureter."  STEDMAN'S MEDICAL DICTIONARY 1293 (28th ed. 2006).

379.)

Kaylor next underwent a retrograde pyelogram at the Indianapolis VAMC on August 11, 1998.  (Tr. 380.)  The doctor noted that his nephroureterectomy of April 1998 was for grade three transitional cell carcinoma, and that in July 1998, two small papillary bladder tumors were discovered at the floor of his bladder.  (Tr. 380.)

On September 22, 1998, Kaylor began a series of six BCG immunotherapy treatments for his bladder.  (Tr. 364, 358.)  On September 30, 1998, he saw Dr. Steidle at the Fort Wayne VAMC, who wrote that Kaylor's case was "extremely difficult" and "very unusual."  (Tr. 359.) Dr. Steidle reported that Kaylor "had upper tract lesions and now has a muscle invasive lesion in his bladder."  (Tr. 359.)  He noted that if the BCGs did not work, then Kaylor would have to have his bladder removed.  (Tr. 359.)  Although Kaylor was experiencing abdominal pain and vomiting, an ultrasound of the gallbladder showed no abnormalities.  (Tr. 360.)  Kaylor's BCG treatments proceeded through October, with the last on November 17, 1998.  (Tr. 358.)

Kaylor was next seen at the Fort Wayne VAMC February 8, 2000, apparently having returned to Fort Wayne six months earlier after being out of the area for seven months and receiving treatment at the Tampa VA Clinic.[8]  (Tr. 353.)  He complained of abdominal pain and daily vomiting, and also noted that he recently had "blood after wiping post BM," although no blood was detected in his stool.  (Tr. 353, 358.)  He reported drinking alcohol four days a week and smoking a pack of cigarettes each day, but he denied drug use and indicated that he exercises more than three times each week.  (Tr. 356-57.)

On March 17, 2000, Kaylor went to the Fort Wayne VAMC for a CT of his abdomen and

---

[8]Although Kaylor's visits to the Tampa clinic is mentioned in the Fort Wayne VAMC record for his visit on February 8, 2000, no medical evidence from the Tampa clinic is included in the record.

pelvis, which revealed "no evidence of recurrent neoplasm, lymphadenopathy or free fluid . . . ." (Tr. 349.).  He returned April 12, 2000, to renew his prescriptions for oxycodone (which he was taking three to four times daily for abdominal and bladder pain) and oxybutynin (for bladder spasms).  (Tr. 348.)  The doctor's impression was bladder cancer, and he ordered urinalysis and creatinine, and stated that they would proceed with a cystoscopy.  (Tr. 247.)

Kaylor went back to the Fort Wayne VAMC to renew his percocet and oxybutanin prescriptions in May 2000, and then again in August 2000, for "suprapubic discomfort" and to undergo a cystoscopy  (Tr. 342-47.)  On September 6, 2000, Kaylor underwent a kidney exam which showed no abnormalities.  (Tr.  343-44.)  He subsequently reappeared again in September, twice in November, and once in December to renew his percocet prescription.  (Tr. 337-40.)

Kaylor went in again in January and February 2001 with a variety of complaints, including abdominal pain, vomiting, and depression.  (Tr. 331-37.)  He underwent another cystoscopy on February 26, 2001, showing no tumors, stones, or lesions.  (Tr. 324-25.)  He visited the clinic throughout 2001 for more pain and anti-nausea medication.  (Tr. 316-23.)

On March 11, 2002, another cystoscopy revealed that Kaylor had a bladder tumor.  (Tr. 314-15.)  He returned on April 29, 2002, for a cystoscopy which revealed two tumors the doctor excised.  (Tr. 306-07.)  The doctor found "bladder tumor times two and diffuse erythema of the bladder, consistent with chronic systitis" and ordered that Kaylor follow up with the clinic.  (Tr. 307.)  Kaylor went back to the clinic in early May, requesting renewal of his medications, and then in mid-May, complaining of pain and some bleeding.  (Tr. 294-95.)  The doctor indicated that Kaylor was "doing fine" and that his "bladder cancer progression [was] low," and he decided to treat Kaylor with BCG therapy.  (Tr. 294.)

Kaylor visited the clinic on May 21, 2002, for sore throat, bee sting, vomiting, and heartburn. (Tr. 292.) Then, on May 28, 2002, Kaylor was presented to the Tumor Board, who determined that he undergo a six-week course of BCG followed by maintenance therapy for three years. (Tr. 289.) On June 19, 2002, he requested that his pain medications be refilled and that he receive a sleep aid. (Tr. 289.) His BCG treatments continued through July. (Tr. 283-86.)

On August 8, 2002, Kaylor visited the clinic due to nausea and "vomiting for y[ea]rs," frequent heartburn, and constant periumbilical pain. (Tr. 280.) A few day s later he underwent an upper gastrointestinal endoscopy with photography and biopsy for his chronic nausea, vomiting, and abdominal pain, and was diagnosed with diffuse gastritis and incompetence of the lower esophageal sphincter. (Tr. 265.) The biopsy revealed no malignancy, but Kaylor's diagnosis was gastric mucosa showing chronic active inflammation. (Tr. 267.)

On September 9, 2002, a cystoscopy resulted in a diagnosis of bladder cancer. (Tr. 262-63.) The doctor recommended that he follow up in six weeks for a three week course of BCG therapy. (Tr. 263.) He then underwent a colonoscopy and biopsy on September 18, 2002, revealing multiple benign colon polyps, which were removed. (Tr. 239-40.) October and November brought the BCG treatments. (Tr. 236-37.)

On December 16, 2002, another cystoscopy revealed no abnormalities, tumors, stones, or lesions. (Tr. 233-34.) The last medical documents included in the record are entries from January and February 2003, and relate to Kaylor's requests that his pain medications be reordered. (Tr. 227-29.)

On March 10, 2003, the state agency physicians determined that the evidence was insufficient to demonstrate the onset of medical problems prior to June 1997. (Tr. 375.)

14

### III. STANDARD OF REVIEW

Section 405(g) of the Social Security Act ("Act") grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart,* 395 F.3d 737, 744 (7th Cir. 2005) (internal quotations and citations omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

### IV. DISCUSSION

#### A. Legal Framework

Under the Act, a plaintiff is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12

months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

In determining whether Kaylor is disabled as defined by the Act, the ALJ conducted the familiar five-step analytical process, which required him to consider the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[9]  *See* 20 C.F.R. §§ 404.1520, 416.920; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled.  *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled.  *Id.*  The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner.  *Clifford*, 227 F.3d at 868.

### B.  The ALJ's Decision

In a written decision issued May 4, 2006, the ALJ determined that Kaylor was not disabled at any time through the DLI, June 30, 1997.  (Tr. 41.)  The ALJ first determined that

---

[9] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations.  20 C.F.R §§ 404.1520(e), 404.1545(a).  The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of.  20 C.F.R. § 404.1520(e).

Kaylor last met the Social Security Act's insured status requirements on June 30, 1997, and that he was not engaged in substantial gainful activity.  (Tr. 39.)  The ALJ next determined that "[t]hrough the date last insured, the objective medical evidence fail[ed] to establish the existence of a medically determinable impairment that could reasonably be expected to produce [Kaylor's] symptoms."  (Tr. 40.)  In making this determination, the ALJ concluded that the testimony of Kaylor and his supporting witnesses was unreliable.  (Tr. 39.)  As stated previously, Kaylor contends that the ALJ erred in failing to develop the record by rendering his opinion without first providing a medical expert, and that the ALJ improperly evaluated Kaylor's credibility.

### C.  The ALJ's Determination to Issue an Unfavorable Decision Without Appointing an Oncological Expert

The claimant has the burden of proving disability, and "must furnish medical and other evidence that [the administration] can use to reach conclusions about [the claimant's] medical impairment(s) and . . . its effect on [his] ability to work on a sustained basis."  20 C.F.R. 404.1512(a).  The regulations specify that it is the claimant's responsibility to "provide medical evidence showing that [he has] an impairment(s) and how severe it is during the time [he] say[s] [he is] disabled."   20 C.F.R. 404.1512(c).  Importantly, "an individual's statement(s) about his . . . symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled."  SSR 96-7P, 1996 WL 374186 at *3.

In the instant case, no medical records exist contemporaneous with the time prior to Kaylor's DLI, June 30, 1997, and herein lies the problem.  Instead, copious medical records begin four months after the expiration of his insured status, the following October, documenting Kaylor's struggle with various painful bladder and kidney ailments that led to the diagnosis of cancer, the first of which was in April of 1998, approximately ten months after his DLI.

17

Although the medical records do not begin until a few months after the expiration of Kaylor's insured status, he reported that he was disabled as of June 15, 1997, and that he started having disabling symptoms as early as October 1996.

The Commissioner reminds us that the claimant has the burden to prove that he had a medically determinable impairment as of the DLI, and that symptom testimony is not enough. Kaylor, however, does not appear to challenge the determination on the sufficiency of the evidence; rather, he contends that the ALJ erred in failing to develop the record in a case such as this; that is, the outcome was inevitable because more information in the form of a medical expert opinion was needed to formulate any opinion. Kaylor believes that after promising to submit his case to a medical expert, the ALJ should have either followed through or given Kaylor an opportunity to do it himself.

Kaylor's claim is factually grounded. At the first hearing, Kaylor was told to dig into his history for "reasonably believable sources" who could corroborate his claim. (Tr. 390.) This is what Kaylor did – he found four people who knew him during that time and who could attest to his condition, at least two of whom could explicitly recall an episode that Kaylor had in their own home. He apparently also tried to get statements from the VA doctors who treated him, but was unable to do so, allegedly because they were no longer available. (Tr. 12.) However, even so, the ALJ did not request that Kaylor retrieve statements from medical sources; in fact, he stated that "*the evidence won't necessarily be medical evidence* directly from a doctor. But we might be able to establish *through other sources*, some measure of your condition, on or about the [DLI]." (Tr. 389-90 (emphasis added).)

Kaylor's counsel then provided the ALJ with the statements at least once prior to the

hearing, and then again at the hearing.  He also highlighted multiple times a piece of medical evidence created after the DLI had passed.  The ALJ, after reviewing the evidence, pondered the next step, and even went so far as to recognize that the question of whether Kaylor's cancer could have severely impaired him at the time of the DLI was a medical one: "I am uncomfortable finding that there's adequate evidence of a – of the continuing problem.  It seems to me really *this becomes a medical question, more, which is good, it seems to me.  More than just a . . . credibility question*."  (Tr. 406 (emphasis added).)  He then indicated that consulting a medical expert would be, at the very least, helpful in developing the record: "However, it seems to me that the nature of these kinds of conditions is sufficiently predictable.  That we might – what [sic] I'll be much more comfortable in writing to a [sic] oncological medical expert."  (Tr. 406.)

The ALJ then apparently decided to consult a medical expert on the matter, instructing Kaylor to submit a detailed statement of his story to assist the medical expert in formulating an opinion.  "What I want you to do is to summarize his testimony.  Give as much detail about what his experience was and have him sign that."  (Tr. 406.)  He then explained, "I will pick out of that what I feel is particularly reliable.  If, if it's not at all.  Maybe it'll be all of it.  I mean if you get that support about his recollection that he's testified to here.  And I'll package that with the essentials of the file.  *And I'll, I'll get a* [sic] *oncological expert somewhere . . . .*"  (Tr. 406 (emphasis added).)

The course of action the ALJ suggested seems to indicate that upon receiving a complete statement from Kaylor, he would put together a package including the statement, the supporting evidence, and "essentials of the file," and get an oncological expert.  The ALJ does not explicitly demand further medical evidence from Kaylor, and any reasonable observer would be left with

the impression that the ALJ was going to undertake that task.  That the ALJ indicated his intent to get a medical expert is further elucidated by his comment that Kaylor's and the Cordell's "strong recollection" of Easter 1997 was "something that's notable and I'll make that point . . . in my interrogatory[.]"  (Tr. 406-07.)  Thus, Kaylor provided the ALJ with exactly what he requested – a verified summary of his condition.

Subsequently, however, the ALJ notified Smith that he apparently changed his mind.  He recognized, "[i]n the second hearing, I agreed to submit new evidence in the form of an affidavit and supplemental medical records to a medical expert in oncology . . . . [and ] announced that I expected that you would provide a comprehensive statement of the claimant's symptoms and signs . . . ."  (Tr. 49.)  However, the ALJ wrote that he "received nothing from either [Smith or Kaylor] that would be worth sending to a medical expert[,]" noting that the only medical records they had were from long after the DLI.  (Tr. 49.)  This turn of events is puzzling, and Kaylor's counsel attempted to rectify the situation, sending forth a Request for Consultive Medical Advice.

The Commissioner weakly argues that Kaylor was on notice that what he had provided was not enough when Smith asked if he could submit the VA records and the ALJ responded that "'Oh, of course.  That's the whole idea is the VA records.  His stuff is just sort of anecdotal.  I'm not sure it'll be so sufficient to the, to the expert.'"  (Comm. Br. 11.)  However, considering that the question merely asked if the 1997 records would also be included, it can hardly be presumed that it was clear that what had been offered to date was insufficient.

Therefore, the ALJ was wrong when he stated in his opinion that after the July 2005 hearing, the "supporting evidence [the ALJ requested] was never afforded to the judge by the

20

claimant." (Tr. 41.)  Rather, Kaylor did exactly as he was instructed – he supplied the ALJ with the signed, detailed statement of background, and even went further by providing questions for the interrogatory.  As we have just explored in detail, to contend otherwise is clearly belied by the record.

The Commissioner points out that it is within the ALJ's discretion whether to consult a medical expert.  (Comm. Br. 14, citing 20 C.F.R. § 404.1527(f)(2)(iii).)  He also notes that the decision as to how much evidence to gather is a judgment call.  (Comm. Br. 16, citing *Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir. 1993).)  This point is well taken; however, the ALJ also has a duty to develop the record, and failure to do so is cause for remand.  *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000).  Here, the ALJ determined that a medical expert's opinion was appropriate, yet ultimately rendered a decision without obtaining it.  After deciding that developing the record through medical expert testimony was the appropriate course of action, he failed to develop the record when he proceeded without it.  *E.g.*, *Wilson v. Bowen*, 1986 WL 6386 at *1 (N.D. Ill. June 3, 1986) (holding that the ALJ failed to develop the record after he determined that additional evidence was needed and erred by denying benefits without considering the evidence).

The Commissioner further argues that it is speculative whether a medical expert might prove Kaylor's claim, and that he has not shown any prejudice.  (Comm. Br. 16.)  However, what we do know is that Kaylor's illness clearly was present just a few months after his DLI, and, it could reasonably be inferred, was present well before the DLI.  Thus, from looking at the available medical record post-DLI, in combination with the statements of Kaylor and his supporting witnesses, an expert could likely determine to a reasonable degree of medical

21

certainty whether Kaylor had a severe impairment pre-DLI.

Because the ALJ wrongly determined that he was never afforded the information he sought, and because he failed to develop the record after he deemed it appropriate, this case must be remanded for further proceedings.  At those proceedings, the ALJ should either provide a medical expert, or allow Kaylor an opportunity to do so.

Because the ALJ supported his determination that the evidence was insufficient to send Kaylor's case to a medical expert because of the lack of credibility of Kaylor and his supporting witnesses, we will move to that issue.

### D.  The ALJ's Determination on Kaylor's Credibility

Kaylor argues that the ALJ improperly evaluated Kaylor's credibility.  (Opening Br. 12.) Specifically, Kaylor argues that the ALJ's erred by 1) finding that Kaylor cheated on his income taxes on the basis of mere speculation; 2) incorrectly reasoning that Kaylor "does not have a long work history"; and 3) failing to support his reason for discounting Kaylor's testimony on the basis of passage of time.  (Opening Br. 13-14.)  Because substantial evidence does not support the ALJ's determination (at least with regard to his findings on Kaylor's income tax and work history), the ALJ's credibility determination will be remanded.

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference.  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).  If an ALJ's determination is grounded in the record, and he articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge from the evidence to [the] conclusion," *Steele v. Barnhart*, 290 F.3d 936, 941 (7th

Cir. 2002) (internal quotation and citation omitted), his determination will be upheld unless it is

"patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754

(7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was

based on "serious errors in reasoning rather than merely the demeanor of the witness . . . .").

In the instant case, the ALJ explained that he found Kaylor unreliable because of "signs

in his history that he is willing to employ deceit to advance his objectives." (Tr. 39.) The ALJ

first asserted that Kaylor "implicitly admit[ted] the practice of cheating on his taxes." (Tr. 39.)

As a result, the ALJ concluded that "[t]his clearly reflects an attitude of contempt for Federal

rules and his responsibility as a citizen to support governance. It raises the question about

whether honesty in a similar context, before a Federal administrative law judge, would be more

important than paying taxes." (Tr. 39.)

Kaylor correctly argues that this determination is based on mere speculation. (Clmnt's

Br. 12.) Although Kaylor admitted he did not pay taxes for several years in the 1990s, there is

no evidence that he had sufficient taxable income during those years to even require the filing of

a return. Indeed, Kaylor worked sporadically, which renders this a likely possibility. Although

the ALJ believes that Kaylor's lack of paying income taxes demonstrates contempt for the

"Federal rules and his responsibility as a citizen to support governance[,]" this conclusion seems

to ignore Kaylor's lengthy service in the United States Army. The ALJ also notes later in the

opinion that Kaylor wrote on his DIB application that he worked as much as ten hours per day.

This alone, however, does not prove that Kaylor had taxable income. Because the ALJ did not

demonstrate his reasoning for his assumption that Kaylor "implicitly admit[ted] the practice of

cheating on his taxes[,]" (Tr. 39,) the ALJ failed to build "an accurate and logical bridge from

the evidence to [the] conclusion."  *Steele*, 290 F.3d at 941.

Next, the ALJ found that Kaylor's credibility was "not supported by a strong work history and by his apparent avoidance of taxes."  (Tr. 40.)  The ALJ elaborated:

> During the hearing the claimant vaguely admitted a practice of not working regularly.  He acknowledged that he lived with his father and work incidentally or not at all because he did not need to work.  The claimant admits that when he worked, he terminated his work at noon on any given day and went home to rest.  The claimant asserts that he did not work in the relevant period, prior to his date last insured, because he was "lazy."  However, while government records seem to support his assertion as they do not show income, there is evidence that he worked.  Affidavits included show that his business was as a contractor for home improvement and roofing . . . .  Prior contradictory statements from the claimant . . . assert that he worked 10 hours per day and as much as 60 hours per week.

(Tr. 40.)

In short, the ALJ does not tell us how a practice of not working regularly leads to the conclusion that that person is not credible.

The ALJ also determined that Kaylor's memory was "unclear" because of the significant passage of time.  (Tr. 40.)  The ALJ is not specific on how or why he drew this conclusion and thus failed to build the necessary bridge to such a conclusion. *Steele*, 290 F.3d at 941. Moreover, the ALJ attempts to bolster his view that the passage of time has caused Kaylor to be not credible because "[Kaylor] and his witnesses described events years into the past.  However, they coincidentally agree on one consistency, the date (Easter 1997), on which the claimant purported to have an episode of painful urination and hematuria." (Tr.  40.)  That Kaylor and his witnesses "coincidentally agree on one consistency" would seem to support credibility, but inexplicably the ALJ used it as a basis for finding Kaylor's memory to be "unclear."  Altogether, the ALJ did not articulate his analysis  "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998 at 1002, as to how the passage of time rendered Kaylor's testimony unreliable.

24

Although the ALJ also properly pointed out an inconsistency in Kaylor's testimony as to how much he worked during the 1990s,  (Tr. 40,) overall his analysis concerning Kaylor's credibility is fatally flawed.

Since the ALJ erred concerning Kaylor's credibility, and because this led, at least in part, to a denial of a medical expert, the Commissioner's final decision will be remanded for further consideration of Kaylor's credibility.[10]

### CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this opinion.  The Clerk is directed to enter a judgment in favor of Kaylor and against the Commissioner.

SO ORDERED.

Enter for this 30th day of November, 2007.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge

---

[10]We note that the petitioner requests that upon remand his case be remanded to a different ALJ.  Given that ALJ Bernstein has already drawn a sharply negative picture of the petitioner's credibility, and since that issue will likely loom large in any further proceedings at the administrative level, the Court recommends that upon remand a different ALJ hear the case.